**WITTELS LAW, P.C.**
Steven L. Wittels
J. Burkett McInturff
18 Half Mile Road
Armonk, New York 10504
Telephone: (914) 319-9945
Facsimile:  (914) 273-2563
slw@wittelslaw.com
jbm@wittelslaw.com

*Attorneys for Plaintiff and the Class*

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **LOUIS MCLAUGHLIN,** | |
| **Individually and on Behalf of All Others Similarly Situated,** | *CLASS ACTION COMPLAINT* |
| **Plaintiff,** | |
| **v.** | Case No: 14-cv-4107 |
| **IDT ENERGY, INC.,** | |
| **Defendant.** | *JURY TRIAL DEMANDED* |

# TABLE OF CONTENTS

OVERVIEW OF IDT'S DECEPTIVE PRACTICES ................................................................... 1

PARTIES ........................................................................................................................... 5

JURISDICTION AND VENUE .............................................................................................. 7

FACTUAL ALLEGATIONS .................................................................................................. 7

I.     The Deregulation of New York's Energy Markets ............................................... 7

II.    IDT's Rapid Expansion ....................................................................................... 8

III.   IDT Hides the Financial Risks Consumers Incur by Switching to IDT ............................ 9

IV.   IDT's Illusory Rebate ........................................................................................ 12

CLASS ACTION ALLEGATIONS ....................................................................................... 16

COUNT I – NEW YORK GENERAL BUSINESS LAW § 349-d(7)
ON BEHALF OF THE VARIABLE RATE SUBCLASS ........................................................... 19

COUNT II – NEW YORK GENERAL BUSINESS LAW § 349-d(3)
ON BEHALF OF THE VARIABLE RATE SUBCLASS ........................................................... 21

COUNT III – NEW YORK GENERAL BUSINESS LAW § 349
ON BEHALF OF THE VARIABLE RATE SUBCLASS ........................................................... 22

COUNT IV – NEW YORK GENERAL BUSINESS LAW § 349-d(3)
ON BEHALF OF THE REBATE SUBCLASS .......................................................................... 23

COUNT V– NEW YORK GENERAL BUSINESS LAW § 349
ON BEHALF OF THE REBATE SUBCLASS .......................................................................... 24

COUNT VI – UNJUST ENRICHMENT
ON BEHALF OF ALL SUBCLASSES ................................................................................... 25

PRAYER FOR RELIEF ....................................................................................................... 26

Plaintiff Louis McLaughlin ("Plaintiff"), by his attorneys Wittels Law, P.C, brings this consumer protection action in his individual capacity, and on behalf of a class of persons defined below, against IDT, Energy, Inc. ("Defendant," "IDT," or the "Company"), and hereby alleges the following with knowledge as to his own acts, and upon information and belief as to all other acts:

## OVERVIEW OF IDT'S DECEPTIVE PRACTICES

1.     Until the late 90s, the rate a residential energy supplier could charge was strictly regulated.  In 1996, however, New York's energy market was opened to competition and gas and electricity consumers were permitted to choose from a variety of companies selling residential energy in addition to traditional utilities like Con Edison.  Seizing on the deregulation in New York and other states, independent energy companies like Defendant IDT Energy, Inc. (called "ESCOs") jumped into the market and have grown rapidly.

2.     Founded in 2004, Defendant IDT quickly became one of the nation's largest ESCOs, now serving over 1 million electric and natural gas customers in New York and four other states and the District of Columbia.  In achieving its rapid expansion, IDT has not simply bested its competitors.  Rather, it has developed and deployed the following deceptive and unlawful marketing and sales practices that result in its energy customers paying far more than they would have paid had they stayed with their traditional energy suppliers.

3.     **The Undisclosed Volatile Variable Rate** – While IDT boasts that its "bottom line" is to "offer choice, reliability and savings," it fails to adequately inform consumers who switch that they can see their energy rates skyrocket.  IDT's rates can shoot up because unlike the vast majority of its competitors, IDT does not primarily offer its energy at a fixed rate.  Instead, like the risky adjustable-rate mortgages that contributed to the financial crisis, IDT's variable energy rates can fluctuate rapidly and have no ceiling.  IDT conceals this fact with an extensive marketing campaign that bombards consumers with promises of savings while failing

1

to warn them of the factors affecting IDT's variable rates and that those factors can fiercely turn. In fact, unlike the fixed rate plans offered by other ESCOs, IDT's variable rate plan limits the Company's exposure to fluctuating energy prices by shifting the risk of these volatile commodity prices onto consumers. IDT, however, doesn't tell consumers this key fact when it trumpets how consumers who switch will save on their monthly energy bills.

4.      IDT's own investor presentations describe the energy company's marketing strategy, stating that the "value proposition" offered to consumers includes an "expectation of savings." The undisclosed truth to consumers, however, is that by switching to IDT they are gambling with their monthly utility bills. Further, the expectation of savings is a mere illusion created by Defendant IDT's misleading conduct.

5.      In particular, Defendant IDT's marketing campaign i) fails to adequately inform consumers that with a variable rate plan the consumers' energy costs can spike at any time, causing substantially increased monthly energy bills; and ii) fails to clearly and conspicuously describe what factors might cause consumers' energy costs to rise. Defendant's omissions violate both New York's ESCO Consumers Bill of Rights, N.Y. Gen. Bus. Law § 349-d(7), which mandates that all ESCO contracts and all ESCO marketing materials clearly and conspicuously describe all variable charges included as part of an energy plan, as well as New York's general consumer protection law, N.Y. Gen. Bus. Law § 349, which prohibits deceptive conduct in consumer transactions.

6.      In stark contrast to what the law requires, IDT's marketing deceptively highlights purported savings but fails to even mention (much less clearly and conspicuously) that IDT's rates are variable and can precipitously rise. For example, in one TV commercial IDT repeatedly encourages customers to "switch and save" and "switch suppliers and start saving." *See* https://www.youtube.com/watch?v=Um0k89TQORk. IDT's hyperbole about the likelihood of saving extends to the radio spots it recently put up throughout the northeast that tell consumers to

"stop worrying" about high energy bills, and "don't go another day worrying about those high energy bills." *See*, e.g. https://www.youtube.com/watch?v=aelt4l16gog. In reality, however, consumers who switch to IDT should be worrying, as they are rolling the dice on IDT's volatile variable energy rates.

7.     Once a consumer has decided to switch to IDT, the Company funnels new customers through an automated, rapid fire telephone enrollment, and like Defendant's marketing, the automated enrollment fails to adequately disclose that IDT's rates are variable rates or the factors that affect those variable rates. The Company buries the existence of the variable rate amid a promotion for its deceptive rebate program; the automated phone enrollment makes only a fleeting and inconspicuous bare bones reference to a variable rate.

8.     IDT's "Terms and Conditions" (the "contract"), which arrives after customers have already switched over to IDT, likewise fails to meet the New York ESCO Consumers Bill of Rights' requirement of clear and conspicuous disclosure about variable energy rates. The contract is chock full of confusing fine print. Moreover, the cursory reference to variable charges is deceptively buried without highlighting or other emphasis amid the prolix of the contract's other paragraphs. This is hardly the conspicuous disclosure mandated by law.

9.     Had IDT provided Plaintiff McLaughlin with adequate and appropriate disclosures about the risks of the Company's variable rate, he would not have switched his electricity account to IDT. He also would not have been an IDT customer when the Company's electricity rates shot up in early 2014 by a shocking 111% from the prior month and then stayed almost as pricey for the two additional months Mr. McLaughlin had to wait to return his account to Con Edison. Mr. McLaughlin was far from the only IDT customer to see his rates spike; according to IDT's securities filings, its electricity revenue jumped 75.8% during this period generating gross profits of $8.8 million.

3

10.     **The Deceptive Rebate Program –** In addition to boasting that customers who switch will save money, Defendant markets a rebate program that is supposed to provide its customers with a refund after 12 months based on the amount of energy purchased.  As bait to show how generous its rebate program is, IDT provides potential customers with estimated rebates based on the potential customer's prior electric and/or natural gas usage.  The estimates, however, are grossly exaggerated and do not reflect the consumer's prior usage or the size of the rebate they are likely to receive.

11.     Further, the rebate IDT actually pays is miscalculated.  For example, the rebate Mr. McLaughlin received for his electricity consumption was approximately 32% lower than the rebate he was owed based on Defendant's rebate formula.

12.     IDT's deceptive rebate program violates both New York's ESCO Consumers Bill of Rights, N.Y. Gen. Bus. Law § 349-d(3), which explicitly prohibits deceptive acts and practices in the marketing of residential energy, as well as New York's general consumer protection statute, N.Y. Gen. Bus. Law § 349.

13.     **Summary of IDT's Unlawful Conduct –** IDT's deceptive enrollment and energy sales practices run afoul of New York State law in multiple ways, including:

    a.  Violating N.Y. G.B.L. § 349-d(7) by failing to clearly and conspicuously disclose in both its contracts and in all marketing materials that IDT charges variable rates;

    b.  Violating N.Y. G.B.L. § 349-d(7) by failing to clearly and conspicuously disclose in both its contracts and in all marketing materials the factors that affect IDT's variable rates;

    c.  Violating N.Y. G.B.L. §§ 349 and 349-d(3) by failing to adequately inform consumers that with IDT's variable rates the consumers' energy costs can precipitously rise;

    d.  Violating N.Y. G.B.L. §§ 349 and 349-d(3) by highlighting potential savings and failing to mention that any purported savings would be quickly erased by a significant increase in energy prices;

4

e.   Violating N.Y. G.B.L. §§ 349 and 349-d(3) by misrepresenting the amount a consumer is likely to receive from IDT's rebate program and bolstering its misrepresentation by stating that those estimates are based on a customer's prior usage; and

f.   Violating N.Y. G.B.L. §§ 349 and 349-d(3) by miscalculating and underpaying its promised rebate.

14.   **Relief Sought** – Plaintiff brings this action on behalf of himself and a Class of IDT customers similarly harmed and described below.  Plaintiff seeks, *inter alia*, statutory damages, treble damages up to ten thousand dollars for each class member, injunctive and declaratory relief, and attorneys' fees and costs.

15.   Only through a class action can the Company's customers remedy IDT's ongoing wrongdoing.  Because the loss suffered by each IDT customer is small compared to the much higher cost a single consumer would incur in trying to challenge IDT's unlawful practices, it makes no financial sense for an individual consumer to bring his or her own lawsuit.  Further, many customers don't even realize they are victims of IDT's deceptive conduct.

16.   With this class action, Plaintiff and the Class seek to level the playing field and make sure that companies like IDT engage in fair and upright business practices.  Plaintiff therefore seeks equitable relief in addition to monetary damages.  Plaintiff asks that the Court declare Defendant's business practices impermissible, and enjoin Defendant from continuing its dishonest practices.

## PARTIES

17.   **Plaintiff Louis McLaughlin** is a citizen of New York residing in Brooklyn, New York.

18.   In June 2012, Mr. McLaughlin was contacted via telephone by an IDT representative.  Based on the representatives' claims about saving money and the $100 estimated rebate he was informed he would receive by purchasing his electricity from IDT for 12 months, Plaintiff agreed to switch his electric account to IDT.  Plaintiff also enrolled both his gas and

electric accounts into IDT's rebate program. (Mr. McLaughlin had previously been purchasing his residential gas from IDT since August 2008, but during that time had his electricity supplied by Con Edison). Once his electricity account was successfully transferred from Con Edison, IDT began supplying Plaintiff's electricity on August 1, 2012.

19.     After Mr. McLaughlin received only a fraction of the $100 estimated rebate and his electricity rate reached unprecedented levels, he notified IDT in February 2014 that he wanted to cancel his gas and electricity accounts. In April 2014 both of Plaintiff McLaughlin's accounts were returned to Con Edison.

20.     **Defendant IDT Energy, Inc.** is a Delaware corporation with its principal place of business at 520 Broad Street in Newark, New Jersey. In November 2004, the global telephone company IDT Corporation launched IDT Energy in New York State. In October 2011, IDT Corporation spun off Genie Energy, Ltd., Defendant's IDT Energy's parent company.

21.     Genie Energy Ltd.'s shares are now traded on the New York Stock Exchange bearing the ticker symbol "GNE." Genie Energy is comprised of IDT Energy and Genie Oil and Gas ("GOGAS"). GOGAS is an oil and gas exploration company with projects in Colorado, Israel and Mongolia. IDT Energy markets and sells residential and commercial gas and electricity to over a million consumers in New York, New Jersey, Pennsylvania, Maryland, Illinois, and the District of Columbia. According to securities filings, IDT Energy is also considering expanding into Massachusetts and Connecticut. IDT Energy's 2013 revenue was $279.2 million.

22.     The Company's securities filings disclose a key difference between it and the vast majority of ESCOs: IDT Energy primarily offers variable rate plans to residential gas and electricity consumers. Unlike the fixed rate plans offered by other ESCOs, IDT's variable rate plans shifts the Company's exposure to volatile commodities prices onto consumers. IDT's investor presentations advertise the Company as having the most variable rate customers of any

6

ESCO.

<u>**JURISDICTION AND VENUE**</u>

**I.      Subject Matter Jurisdiction**

23.      This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332 (the "Class Action Fairness Act").

24.      This action meets the prerequisites of the Class Action Fairness Act, because the claims of the Class defined below exceed the sum or value of $5,000,000, the Class has more than 100 members, and diversity of citizenship exists between at least one member of the Class and Defendant.

**II.      Personal Jurisdiction**

25.      This Court has general personal jurisdiction over Defendant IDT because since its inception in 2004, IDT has been doing business in New York through continuous, permanent, and substantial activity in New York.

26.      This Court has specific personal jurisdiction over Defendant IDT because it maintains sufficient contacts in this jurisdiction, including the advertising, marketing, distribution and sale of natural gas and electricity to New York consumers.

**III.      Venue**

27.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2).  Substantial acts in furtherance of the alleged improper conduct occurred within this District and Plaintiff McLaughlin resides within this District.

<u>**FACTUAL ALLEGATIONS**</u>

**I.      The Deregulation of New York's Energy Markets**

28.      In 1996, New York deregulated the sale of retail gas and electricity.  As a result of deregulation, New York consumers can purchase natural gas and electricity through third-party suppliers while continuing to receive delivery of the energy from their existing public utilities.

These third-party energy suppliers are known as energy service companies, or "ESCOs." Since New York opened its retail gas and electric markets to competition, more than a million New York consumers have switched to an ESCO.

29.     ESCOs are subject to minimal regulation by New York's utility regulator, the New York State Public Service Commission (the "PSC"). ESCOs like IDT do not have to file their rates with the PSC, or the method by which those rates are set.

30.     If a customer switches to an ESCO, the customer will then have his or her energy "supplied" by the ESCO, but still "delivered" by their existing utility (in the New York metro area, typically Con Edison). The customer's existing utility then continues to bill the customer for both the energy supply and delivery costs. The only difference to the customer is which company sets the price for the customer's energy supply.

31.     After a customer switches to an ESCO, the customer's energy supply charge [based either on a customer's kilowatt hour (electricity) or therm (gas) usage] is calculated using the supply rate charged by the ESCO and not the regulated rate charged by customer's former utility. The supply rate charged is itemized on the customer's bill as the number of kilowatt hours ("kWh") or therms multiplied by the rate. For example, if a customer uses 145 kWh at a rate of 10.0¢ per kWh, the customer will be billed $14.50 (145 x $.10) for their energy supply.

## II.     IDT's Rapid Expansion

32.     Founded in 2004, Defendant IDT first supplied energy to consumers only in New York State. According to its website, IDT has since "grown into one of the leading suppliers of electric and natural gas" in the northeast and has become one of the largest ESCOs in the United States. With annual revenue surpassing $279 million and a New York market share of nearly 20%, IDT is a dominate player in the deregulated energy markets. IDT's success, however, comes at consumers' expense. Using deceptive business tactics, IDT has taken advantage of deregulation and the resulting lack of oversight to sweep up customers eager to lower their

8

household energy costs. While the acts described below harmed Plaintiff McLaughlin in New York, IDT's deceptive acts have injured customers everywhere it sells energy.

## III. IDT Hides the Financial Risks Consumers Incur by Switching to IDT

33. N.Y. G.B.L. § 349-d, the Energy Services Company Consumers Bill of Rights, was enacted to "establish[] important consumer safeguards in the marketing and offering of contracts for energy services to residential and small business customers." *See* New York Sponsors Memorandum, 2009 A.B. 1558, at 1 (2009) attached as **Exhibit A**. As the sponsoring memorandum notes, Section 349-d sought to end the exact type of deceptive conduct Plaintiff challenges here:

> Over the past decade, New York has promoted a competitive retail model for the provision of electricity and natural gas. Consumers have been encouraged to switch service providers from traditional utilities to energy services companies. Unfortunately, consumer protection appears to have taken a back seat in this process.
>
> * * *
>
> High-pressure and *misleading sales tactics*, onerous contracts with unfathomable *fine print*, short-term "teaser" rates followed by *skyrocketing* variable prices – many of the problems recently seen with subprime mortgages are being repeated in energy competition. Although the PSC has recently adopted a set of guidelines, its "Uniform Business Practices" are limited and omit important consumer protections in several areas. The fact is, competition in supplying energy cannot succeed without a meaningful set of standards to weed out companies whose business model is based on taking unfair advantage of consumers.

*Id*. at 3-4 (emphasis added).

34. As a result of the above-described concerns, the Legislature adopted two crucial safeguards meant to protect New York's residential energy consumers. First, N.Y. G.B.L. § 349-d(3), which prohibits deceptive acts or practices in the marketing of energy services. Second, N.Y. G.B.L. § 349-d(7), which requires that "[i]n every contract for energy services and in all marketing materials provided to prospective purchasers of such contracts, all variable charges shall be clearly and conspicuously identified."

35. Through its conduct, IDT has violated both the spirit and letter of N.Y. G.B.L. §

9

349-d, the law that is explicitly designed to allow energy consumers to make informed choices: "These provisions will go a long way toward restoring an orderly marketplace where consumers can make informed decisions on their choices for gas and electric service . . . ." Exhibit A, New York Sponsors Memo at 4.

36. At all relevant times Mr. McLaughlin was charged variable rates for the energy he purchased from IDT. Defendant, however, never clearly and conspicuously apprised him of its variable rates, or the risk the variable rates posed to his finances.

37. Defendant's telephone sales scripts, mailers, radio and television spots, and other marketing materials are deceptive because they highlight that IDT will save consumers on their utility bills but fail to inform consumers that a spike in energy rates can dramatically increase their energy costs. These marketing materials also violate N.Y. G.B.L. § 349-d(7) by not clearly and conspicuously setting forth all of the factors affecting IDT's variable rates. Indeed, the marketing materials don't even mention that IDT's rates are variable, nor do they comply with the statute's conspicuousness requirement. Further, as described below, the various incarnations of IDT's Terms and Conditions since at least June 2012 as well as Defendant's telephonic enrollment system also violate N.Y. G.B.L. § 349-d(7).

38. Upon information and belief, the IDT sales rep who signed up Mr. McLaughlin during a marketing call in 2012 used IDT's standard sales script, and emphasized that customers who switch to IDT save money. The sales rep failed to mention, however, that any purported savings would be quickly erased by a significant increase in energy prices. Based on the sales rep's statements, Mr. McLaughlin decided to switch his electricity account from Con Edison to IDT.

39. Upon information and belief, the call script IDT's representative used to solicit Mr. McLaughlin also did not contain language clearly and conspicuously explaining that IDT's rates are variable, nor did the script describe the factors that affect IDT's variable rates.

10

40.     Following his agreement to switch his electricity account to IDT, Mr. McLaughlin's enrollment was confirmed by IDT's automated enrollment system.  During the rapid fire enrollment process, Defendant failed to provide the lawfully mandated clear and conspicuous disclosure that the energy company charges a variable rate.  Rather, the speedy enrollment process highlighted the advantages of the Company's rebate program while mentioning a variable rate only in passing, thus stressing the savings from switching but not adequately disclosing the risks.

41.     The mailers Mr. McLaughlin received after he confirmed his enrollment also uniformly fail to mention that IDT charges a variable rate, much less clearly and conspicuously describe the various factors that can cause IDT's rates to rise.  For example, the welcome letter Mr. McLaughlin received after completing the automated telephone enrollment prominently touts that IDT is a company "where we put *your* energy needs first" but is entirely silent about its variable rates.  *See* Welcome Letter, attached as **Exhibit B** (emphasis in original).

42.     Similarly, the contract, which the Company provides only *after* a customer is already enrolled, likewise fails to make the clear and conspicuous disclosure of Defendant's variable rates as mandated by New York's ESCO Consumers Bill of Rights.   The contract states incoherently that:  [t]he variable price for all electricity and natural gas sold under this Agreement and established on an approximately monthly basis based upon electricity and natural gas market pricing, transportation or transmission, and other market and business price related factors. [*Sic*]. Terms and Conditions, attached as **Exhibit C**.

43.     Not only is this one-liner incomprehensible, but it is also inconspicuous.  Hidden in the same small print as all the other "terms" in the form contract, this obtuse reference to a variable rate is the opposite of clear and conspicuous.  There are no special boxes, colors, or larger font sizes to set off Defendant's nebulous reference.  *See* Exhibit C.  IDT's contract not only violates N.Y. G.B.L. § 349-d(7), but also contradicts the  "Consumer Bill of Rights" posted on IDT's webpage

which states that IDT's customers are entitled to clear and simple disclosure of the terms and conditions of their agreement with IDT, including "price and all variable charges or fees."

44.     In fact, Defendant IDT's entire marketing strategy violates the pledge heralded on the Company's website: to "[p]rotect customers participating in the deregulated energy market." Mr. McLaughlin would have never signed up to be part of IDT's energy market gamble had he been adequately informed that, unlike the regulated rates charged by his local utility, IDT's rates could go through the roof. Similarly, Mr. McLaughlin would have never switched to IDT had the Company clearly and conspicuously described the factors that cause its rates to fluctuate.

45.     Unfortunately, in January 2014, IDT's rates did in fact go through the roof. At that point, IDT increased Plaintiff McLaughlin's electricity rate from the prior month by 111% to an unprecedented 27.5¢ per kWh. February was almost as bad for Mr. McLaughlin when IDT billed him a kWh rate of 25.6¢. In March 2014 (the last month Plaintiff was an IDT customer) he was saddled with a 20.2¢ per kWh rate.

46.     Mr. McLaughlin was not alone. According to IDT's securities filings, these "extraordinarily large spikes," some of which were as large as eight times the prior level, occurred in all of the markets where IDT sells energy. As a result of these spikes, IDT's revenues from electricity grew 94.9% year over year to $96 million. IDT's gross profit on these spikes was $8.8 million. Its customers saw only losses.

47.     If IDT had given Plaintiff McLaughlin adequate disclosures concerning its variable rates, he would not have switched to IDT. Similar to other reasonable consumers who were harmed by IDT's conduct, Mr. McLaughlin had no choice but to pay IDT's inflated rates.

## IV.     IDT's Illusory Rebate

48.     During the 2012 marketing call to Mr. McLaughlin, the IDT representative told Plaintiff McLaughlin that if he switched he would gain the benefit of IDT's rebate program. Upon information and belief, this is a core message of Defendant's standard sales script.

49.     Enrollment in IDT's rebate program was supposed to provide customers a refund based on the amount of energy they purchased during the prior 12 months. The representative led Mr. McLaughlin to believe that based on his prior usage he would likely receive a $100 check. The representative did not tell Plaintiff McLaughlin how the estimate or the rebate was calculated. Having had relatively steady energy consumption at his home in Brooklyn for the preceding five years, Mr. McLaughlin relied on the estimated rebate in making the decision to begin purchasing his electricity from IDT.

50.     On August 4, 2012, IDT mailed Plaintiff McLaughlin the "Additional Terms and Conditions for the IDT Energy Rebate Program" which stated that his "start date" was August 4, 2012. *See* Additional Terms, attached as **Exhibit D**. The Additional Terms repeated and reinforced the sales rep's $100 rebate estimate. It presented $100 as the average rebate and stated "***All Rebate amounts advertised and presented to Buyers are estimates based upon Buyer's prior electric and/or natural gas usages.***" *Id*. (emphasis in original). Similar to the phone call from the IDT representative, the Additional Terms did not describe how Mr. McLaughlin's rebate would be calculated; leaving Plaintiff with no way to verify whether IDT's estimate was accurate, or (as it turned out) embellished.

51.     Mr. McLaughlin later received in the mail IDT's 14-inch, single-spaced, form contract which like the Additional Terms states that "**[a]ll rebate amounts advertised and Presented (sic) to customers are estimated based upon customer's prior electric and/or natural gas usages.**" *See* Exhibit C. Similar to the sales pitch and the Additional Terms, IDT's contract omits any mention of how the promised rebate is calculated.

52.     For the next 12 months, Mr. McLaughlin continued using energy in his home in the same way he had for the previous five years. By making no significant changes in his energy consumption, Mr. McLaughlin purchased almost the same amount of energy he had the prior year. The graph on the next page shows the approximate average daily electricity usage in

Plaintiff McLaughlin's home during both the year he was a participant in IDT's rebate program (Red) and the prior year (Blue, which is the "prior usage" IDT stated that it relied on to estimate Mr. McLaughlin's rebate).



53. Mr. McLaughlin's gas usage during the relevant periods was no different, fluctuating at most one therm above or below the two therms per month usually consumed in his household.

54. Despite the lack of a material change in Plaintiff's energy consumption, and far from the rosy estimate that lured Mr. McLaughlin into becoming an IDT electricity customer, on September 17, 2013 Defendant sent Mr. McLaughlin a rebate check for only $23.26. While the $23.26 was attributable to only Plaintiff's electricity usage, upon information and belief, Defendant also sent Plaintiff a $5.00 rebate check for his gas consumption. This total $28.26, however, is less than one third of the rebate estimate IDT provided at the time he was solicited to switch to IDT.

55. Mr. McLaughlin's energy consumption during the rebate period, however, was not two thirds less than his prior consumption: it was almost identical. Indeed, the following

graph compares Plaintiff McLaughlin's average daily energy consumption during 2011 (Blue) with a hypothetical customer who used only one third of the energy the following year (Red).



56.     In short, IDT's low-ball rebate had no relation to the $100 estimate purportedly based on Plaintiff's prior energy usage, a fact Mr. McLaughlin only learned when he received IDT's parsimonious refund.

57.     Accompanying the small rebate check Plaintiff received in September 2013 was an additional mailer insert that shows three things: (1) the company miscalculated and underpaid Mr. McLaughlin's rebate, (2) it reveals how inaccurate and inflated IDT's $100 estimate was, and adding insult to injury (3) it attempts to lull consumers like Plaintiff into continuing on IDT's rebate plan.  The insert urges customers to continue purchasing their energy from IDT, stating "[c]ustomers who use an average of 1,000 therms (natural gas) and 12,0000 (kWh) could see an annual rebate of up to $150 or more." *See* Mailer Insert, attached as **Exhibit E**.[1]  Aside from the

---

[1] Unfortunately for consumers, IDT's mailer (and all of its other marketing) fails to lay out the formula it uses to arrive at the $150.

fact that IDT was well aware that at all relevant times Mr. McLaughlin never consumed even close to this amount (his consumption never even reached 40 therms and 4000 kWh per year), IDT's example shows that it underpaid Mr. McLaughlin by approximately 32%.

58.     In order to arrive at a $150 rebate for the hypothetical household that consumed 1,000 therms and 12,000 kWh, each kWh used would have to be reimbursed 1¢ (12,000 x $.01= $120) and each therm would have to be reimbursed 3¢ (1,000 x $.03= $30).  Thus, using the Company's formula Mr. McLaughlin should have received a check for about $34.00 based on his approximately 3,400 kWh consumption during the relevant period, and not the smaller $23.00 check he received for that usage.

59.     Not only did IDT deceive Plaintiff with the bait of a $100 check that was supposedly based on his prior usage, but the Company also did not honor its own formula for calculating the rebate owed.

60.     IDT's deceptive rebate ploy proved successful in luring in Mr. McLaughlin together with thousands of other IDT customers, a fact noted in the Company's securities filings: "IDT Energy's rebate programs keyed to new customer acquisition and retention have . . . accelerated customer acquisition in recent quarters and intensified competition in some utility territories."  Just like Mr. McLaughlin, those other IDT customers were harmed by Defendant's unlawful conduct.

## CLASS ACTION ALLEGATIONS

61.     Plaintiff sues on his own behalf and on behalf of a Class for damages and injunctive relief under Rules 23(a), (b)(2), (b)(3), and (c)(4) of the Federal Rules of Civil Procedure.

62.     The Class, preliminarily defined as two subclasses, is as follows:

a.  All IDT customers who were charged a variable rate for their energy from July 2, 2008 and thereafter (the "Variable Rate Subclass"); and

16

b. All IDT customers who participated in IDT's rebate program from July 2, 2008 and thereafter (the "Rebate Subclass").

63.    Excluded from the Subclasses are the officers and directors of Defendant, members of the immediate families of the officers and directors of Defendant, and its legal representatives, heirs, successors or assigns and any entity in which Defendant has or has had a controlling interest. Also excluded are all federal, state and local government entities; and any judge, justice or judicial officer presiding over this action and the members of their immediate families and judicial staff.

64.    Plaintiff does not know the exact size of the Subclasses (hereafter collectively the "Class" unless otherwise specified), since such information is in the exclusive control of Defendant. Plaintiff believes, however, that based on the number of IDT customers, the Class encompass hundreds of thousands of individuals whose identities can be readily ascertained from Defendant's records. Plaintiffs also believe that both the Rebate Subclass and the Variable Rate Subclass each have hundreds of thousands of members. Accordingly, the members of the Class are so numerous that the joinder of all such persons is impracticable.

65.    Plaintiff is an adequate class representative. His claims are typical of the claims of the Class and do not conflict with the interests of any other members of the Class. Plaintiff and the other members of the Class were subject to the same or similar conduct. Further, Plaintiff and the Class sustained substantially the same injuries and damages arising out of Defendant's conduct.

66.    Plaintiff will fairly and adequately protect the interests of all Class members. Plaintiff has retained competent and experienced class action attorneys to represent his interests and those of the Class.

67.    Questions of law and fact are common to the Class and predominate over any questions affecting only individual Class members, and a class action will generate common

answers to the questions below, which are apt to drive the resolution of this action:

    a. Whether Defendant's conduct violates New York General Business Law §349-d;

    b. Whether Defendant's conduct violates New York General Business Law §349;

    c. Whether Defendant was unjustly enriched as a result of its conduct;

    d. Whether the Class members have been injured by Defendant's conduct;

    e. Whether, and to what extent, equitable relief should be imposed on Defendant to prevent it from continuing its unlawful practices; and

    f. The extent of class-wide injury and the measure of damages for those injuries.

68.    A class action is superior to all other available methods for resolving this controversy because i) the prosecution of separate actions by Class members will create a risk of adjudications with respect to individual Class members that will, as a practical matter, be dispositive of the interests of the other Class members not parties to this action, or substantially impair or impede their ability to protect their interests; ii) the prosecution of separate actions by Class members will create a risk of inconsistent or varying adjudications with respect to individual Class members, which will establish incompatible standards for Defendant's conduct; iii) Defendant has acted or refused to act on grounds generally applicable to all Class members; and iv) questions of law and fact common to the Class predominate over any questions affecting only individual Class members.

69.    Further, the following issues are also appropriately resolved on a class-wide basis under Fed. R. Civ. P. 23(c)(4):

    a. Whether Defendant's conduct violates New York General Business Law §349-d;

    b. Whether Defendant's conduct violates New York General Business Law §349;

c. Whether Defendant was unjustly enriched as a result of its conduct; and

d. Whether, and to what extent, equitable relief should be imposed on Defendant to prevent it from continuing its unlawful practices;

70. Accordingly, this action satisfies the requirements set forth under Fed. R. Civ. P. 23(a), 23(b), and 23(c)(4).

## CAUSES OF ACTION

### COUNT I

### NEW YORK GENERAL BUSINESS LAW § 349-d(7)

### (ON BEHALF OF THE VARIABLE RATE SUBCLASS)

71. Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

72. Plaintiff brings this claim under N.Y. G.B.L. § 349-d(7) on his own behalf and on behalf of each member of the Variable Rate Subclass who became an IDT energy or gas customer on or after January 10, 2011, the operative date of Section 349-d.

73. N.Y. G.B.L. § 349-d(7) provides that "[i]n every contract for energy services and in all marketing materials provided to prospective purchasers of such contracts, all variable charges shall be clearly and conspicuously identified."

74. None of Defendant's marketing materials disclose that IDT charges a variable rate, much less do they make the required disclosure in a clear and conspicuous manner. Indeed, the mailers created and distributed by IDT to Plaintiff McLaughlin and prospective customers also make no reference at all to the fact that IDT's rates are variable, and similarly fail to provide a clear and conspicuous explanation of the factors affecting IDT's variable rates.

75. Part of Defendant IDT's marketing strategy is also to rely on telephone solicitations to convince customers to switch to Defendant IDT. The call scripts IDT's

representatives use to solicit customers do not clearly and conspicuously inform consumers that IDT's energy rates are variable nor do they describe all of the factors affecting IDT's variable rates. Similarly, IDT's automated telephone enrollment system fails to clearly and conspicuously disclose that IDT charges a variable rate.

76.     The Terms and Conditions Defendant IDT has provided to customers since January 10, 2011 – after they are enrolled – likewise does not clearly and conspicuously inform consumers about IDT's variable energy rates or the factors affecting IDT's variable rates.

77.     Through its conduct described above, Defendant has violated N.Y. G.B.L. § 349-d(7) and caused financial injury to Plaintiff and IDT's other variable rate customers.

78.     Because IDT's Terms and Conditions violate N.Y. G.B.L. § 349-d(7), they are void and unenforceable as contrary to New York's public policy under Section 349-d(8). Further, any purported waiver by Plaintiff of the rights afforded by Section 349-d is void and unenforceable by IDT. *See* N.Y. G.B.L. § 349-d(8).

79.     N.Y. G.B.L. §349-d(10) also provides that "any person who has been injured by reason of any violation of this section may bring an action in his or her own name to enjoin such unlawful act or practice, an action to recover his or her actual damages or five hundred dollars, whichever is greater, or both such actions. The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to ten thousand dollars, if the court finds the defendant willfully or knowingly violated this section. The court may award reasonable attorney's fees to a prevailing plaintiff."

80.     As a direct and proximate result of Defendant's conduct, Plaintiff and the Variable Rate Subclass have suffered injury and monetary damages in an amount to be determined at the trial of this action but not less than $500 for each violation, such damages to be trebled, plus attorneys' fees.

81.     Plaintiff and the other members of the Variable Rate Subclass further seek an order enjoining Defendant from undertaking any further unlawful conduct.  Pursuant to N.Y. G.B.L. § 349-d(10), this Court has the power to award such relief.

## COUNT II

## NEW YORK GENERAL BUSINESS LAW § 349-d(3)

## (ON BEHALF OF THE VARIABLE RATE SUBCLASS)

82.     Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

83.     N.Y. G.B.L. §349-d(3) provides that "[n]o person who sells or offers for sale any energy services for, or on behalf of, an ESCO shall engage in any deceptive acts or practices in the marketing of energy services."

84.     Defendant offers for sale energy services for and on behalf of an ESCO.

85.     Plaintiff brings this claim under New York General Business Law §349-d(3) on his own behalf and on behalf of each member of the Variable Rate Subclass who was an IDT customer on or after January 10, 2011.

86.     Defendant has engaged in, and continues to engage in, deceptive acts and practices in violation of N.Y. G.B.L. § 349-d(3) by (i) failing to adequately inform consumers that with IDT's variable rates the consumers' energy costs can precipitously rise, and (ii) by highlighting potential savings and failing to mention that any purported savings would be quickly erased by a significant increase in energy prices.

87.     The aforementioned acts are willful, unfair, unconscionable, deceptive, and contrary to the public policy of New York, which aims to protect consumers.

88.     As a direct and proximate result of Defendant's unlawful deceptive acts and practices, Plaintiff and the Variable Rate Subclass have suffered injury and monetary damages in

an amount to be determined at the trial of this action but not less than $500 for each violation, such damages to be trebled, plus attorneys' fees.

89.     Plaintiff and the other members of the Variable Rate Subclass further seek an order enjoining Defendant from undertaking any further unlawful conduct.  Pursuant to N.Y. G.B.L. § 349-d(10), this Court has the power to award such relief.

## COUNT III

## NEW YORK GENERAL BUSINESS LAW § 349

### (ON BEHALF OF THE VARIABLE RATE SUBCLASS)

90.     Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

91.     Plaintiff brings this claim under N.Y. G.B.L. §349 on his own behalf and on behalf of each member of the Rebate Subclass.

92.     Defendant has engaged in, and continues to engage in, deceptive acts and practices in violation of N.Y. G.B.L. §349 by (i) failing to adequately inform consumers that with IDT's variable rates the consumers' energy costs can precipitously rise, and (ii) by highlighting potential savings and failing to mention that any purported savings would be quickly erased by a significant increase in energy prices.

93.     The aforementioned acts are willful, unfair, unconscionable, deceptive, and contrary to the public policy of New York, which aims to protect consumers.

94.     As a direct and proximate result of Defendant's unlawful deceptive acts and practices, Plaintiff and the Variable Rate Subclass have suffered injury and monetary damages in an amount to be determined at the trial of this action but not less than $50 for each violation, such damages to be trebled, plus attorneys' fees.

95. Plaintiff and the other members of the Variable Rate Subclass further seek equitable relief against Defendant. Pursuant to N.Y. G.B.L. §349, this Court has the power to award such relief, including but not limited to, an order declaring Defendant's practices as alleged herein to be unlawful, an order enjoining Defendant from undertaking any further unlawful conduct, and an order directing Defendant to refund to Plaintiff and the Variable Rate Subclass all amounts wrongfully assessed, collected, or withheld.

**COUNT IV**

**NEW YORK GENERAL BUSINESS LAW § 349-d(3)**

**(ON BEHALF OF THE REBATE SUBCLASS)**

96. Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

97. Plaintiff brings this claim under New York General Business Law §349-d(3) on his own behalf and on behalf of each member of the Rebate Subclass who was an IDT customer on or after January 10, 2011.

98. N.Y. G.B.L. §349-d(3) provides that "[n]o person who sells or offers for sale any energy services for, or on behalf of, an ESCO shall engage in any deceptive acts or practices in the marketing of energy services."

99. Defendant offers for sale energy services for and on behalf of an ESCO.

100. Defendant has engaged in, and continues to engage in, deceptive acts and practices in violation of N.Y. G.B.L. § 349-d(3) by:

      a. Misrepresenting the amount a consumer is likely to receive from IDT's rebate program and bolstering its misrepresentation by stating that those estimates are based on a customer's prior usage; and

      b. Miscalculating and underpaying its promised rebate.

101. The aforementioned acts are willful, unfair, unconscionable, deceptive, and contrary to the public policy of New York, which aims to protect consumers.

102.    As a direct and proximate result of Defendant's conduct, Plaintiff and the Rebate Subclass have suffered injury and monetary damages in an amount to be determined at the trial of this action but not less than $500 for each violation, such damages to be trebled, plus attorneys' fees.

103.    Plaintiff and the other members of the Rebate Subclass further seek an order enjoining Defendant from undertaking any further unlawful conduct.  Pursuant to N.Y. G.B.L. § 349-d(10), this Court has the power to award such relief.

## COUNT V

## NEW YORK GENERAL BUSINESS LAW § 349

## (ON BEHALF OF THE REBATE SUBCLASS)

104.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

105.    Plaintiff brings this claim under N.Y. G.B.L. §349 on his own behalf and on behalf of each member of the Rebate Subclass.

106.    N.Y. G.B.L. §349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state."

107.    Defendant's acts described herein are consumer-oriented in that they are directed at members of the consuming public.

108.    Defendant has engaged in, and continues to engage in, deceptive acts and practices in violation of N.Y. G.B.L. §349 by:

    a.  Misrepresenting the amount a consumer is likely to receive from IDT's rebate program and bolstering its misrepresentation by stating that those estimates are based on a customer's prior usage; and

    b.  Miscalculating and underpaying its promised rebate.

24

109.     The aforementioned acts are willful, unfair, unconscionable, deceptive, and contrary to the public policy of New York, which aims to protect consumers.

110.     As a direct and proximate result of Defendant's unlawful deceptive acts and practices, Plaintiff and the Rebate Subclass have suffered injury and monetary damages in an amount to be determined at the trial of this action but not less than $50 for each violation, such damages to be trebled, plus attorneys' fees.

111.     Plaintiff and the other members of the Rebate Subclass further seek equitable relief against Defendant.  Pursuant to N.Y. G.B.L. §349, this Court has the power to award such relief, including but not limited to, an order declaring Defendant's practices as alleged herein to be unlawful, an order enjoining Defendant from undertaking any further unlawful conduct, and an order directing Defendant to refund to Plaintiff and the Rebate Subclass all amounts wrongfully assessed, collected, or withheld.

## COUNT VI

## UNJUST ENRICHMENT

### (IN THE ALTERNATIVE AND ON BEHALF OF ALL SUBCLASSES)

112.     Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

113.     Plaintiff brings this claim on his own behalf and on behalf of each member of the Class.

114.     As a result of its deceptive, unlawful, and unfair conduct, Defendant has been enriched by (i) failing to adequately disclose to consumer that it charges variable rates and the factors that can cause its rates to spike, (ii) highlighting potential savings and failing to mention that any purported savings would be quickly erased by a significant increase in energy prices, (iii) misrepresenting the amount a consumer is likely to receive from IDT's rebate program and

bolstering its misrepresentation by stating that those estimates are based on a customer's prior usage, and (iv) miscalculating and underpaying its promised rebate.

115.    By reason of Defendant's wrongful conduct, Defendant has benefited from receipt of improper funds, and under principles of equity and good conscience, Defendant should not be permitted to keep this money.

116.    As a result of Defendant's collection of excessive energy charges and failure to make adequate rebates, it would be unjust and/or inequitable for Defendant to retain the benefits of its conduct without restitution to Plaintiff and the Class of the monies paid to Defendant. Accordingly, Defendant must account to Plaintiff and the Class for its unjust enrichment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Louis McLaughlin respectfully requests that the Court:

(a) Issue an order certifying the Classes defined above, appointing the Plaintiff as Class representative, and designating the undersigned firm as Class Counsel;

(b) Find that Defendant has committed the violations of law alleged herein;

(c) Enter an order granting monetary relief pursuant to G.B.L. §349-d on behalf of the Class;

(d) Enter an order granting monetary relief pursuant to G.B.L. §349 on behalf of the Class;

(e) Determine that Defendant has been unjustly enriched as a result of its wrongful conduct, and enter an appropriate order awarding restitution and monetary damages to the Class;

(f) Render an award of compensatory damages of at least $50,000,000, the precise amount of which is to be determined at trial;

(g) Issue an injunction or other appropriate equitable relief requiring Defendant to refrain from engaging in the deceptive practices alleged herein;

(h) Render an award of punitive damages;

(i) Enter judgment including interest, costs, reasonable attorneys' fees, costs, and expenses; and

(j) Grant all such other relief as the Court deems appropriate.


Dated:  July 2, 2014
       Armonk, New York

                          **WITTELS LAW, P.C.**

                          By:       /s/
                                  Steven L. Wittels (SW-8110)
                                  J. Burkett McInturff (JM-4564)

                                  18 HALF MILE ROAD
                                  ARMONK, NEW YORK 10504
                                  Telephone: (914) 319-9945
                                  Facsimile:   (914) 273-2563
                                  slw@wittelslaw.com
                                  jbm@wittelslaw.com

                                  *Attorneys for Plaintiff and the Class*